**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **WAYNE WARREN, by and through his Mother, next friend and legal guardian, Polly Robinson,** | } } } } | |
| **Plaintiff,** | } } | **Case No.:  7:16-cv-01666-RDP** |
| **v.** | } } | |
| **ALABAMA DEPARTMENT OF MENTAL HEALTH, et al.,** | } } } | |
| **Defendants.** | } | |

**<u>MEMORANDUM OPINION</u>**

This case is before the court on Defendant Estate of Perry Walker's ("the Estate") Motion for Summary Judgment (Doc. # 39) and Defendant Alabama Department of Mental Health's ("ADMH") Motion for Summary Judgment (Doc. # 41). The Motions are fully briefed (Docs. # 46-47, 50-51, 54-55, 57) and are ripe for review. After careful review of the parties' submissions and having conducted oral argument on the Estate's Motion, and for the reasons explained below, the court concludes that ADMH's Motion for Summary Judgment is due to be granted, while the Estate's Motion is due to be granted in part and denied in part.

**I.     Factual Background[1]**

This case arises out of an incident that took place on April 2, 2005,[2] when a Mental Health Worker employed by ADMH instructed Plaintiff to hit his roommate on the head with a

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

radio in order to quell a disturbance. The court begins by giving a brief overview of Plaintiff's behavioral history at William D. Partlow Development Center ("Partlow"). It then discusses the history of R.G.,[3] Plaintiff's roommate, and the relationship between R.G. and Plaintiff. Finally, the court outlines Perry Walker's employment record at Partlow and his role in the events forming the basis of this action.

### A. Plaintiff's Behavioral History at Partlow

In August 2003, Wayne Warren ("Plaintiff") was admitted to Partlow, a facility maintained by ADMH. (Doc. # 46 at 2). He had a documented history of aggression and a diagnosis of Atypical Psychosis, Schizoaffective Disorder, and mild to moderate mental retardation. (*Id.*). Although his IQ is in the mid-50's (Doc. # 46-4 at 5), his social worker at Partlow noted that he is "verbal and comprehends what is said to him." (Doc. # 46-2 at 2).

From March 2004 to April 2005, Plaintiff's psychiatrist, Dr. Baltz, reported that Plaintiff displayed intermittent aggressive tendencies towards the staff as well as other patients, and at various times the following was documented:

- "[C]ontinues to virtually run amuck here. He has been threatening to beat up the staff, fighting with the patients and he tore up his room. He attacked his roommate the first night at about four o'clock in the morning. Kicked holes in the walls over in administration building." (Doc. # 46-2 at 7).

---

[2] Although the subject incident occurred eleven years before this action was filed, this court previously held that Plaintiff was entitled to the benefits of Alabama's generous tolling provision for individuals suffering from intellectual disabilities under Alabama Code § 6-2-8(a), which provides a twenty year cap on all claims brought by lifelong mentally incapacitated individuals. *Warren by and through Robinson v. Alabama Department of Mental Health*, 2017 WL 1282244, at *3 (N.D. Ala. April 6, 2017).

[3] The court uses initials for this resident because in the past he has sued ADMH and Partlow Mental Health Workers alleging sexual assault by a co-resident. (Doc. # 1 at 3, FN 4).

- "Seems calmer to the staff. He doesn't appear anxious, but does complain about being nervous and he occasionally will say that he wants to go to the hospital. Has no major outbursts." (*Id*. at 8).

- "[O]verall hasn't been as disruptive and assaultive. He will still hit some of the patients from time to time." (*Id*. at 9).

- "[A]pparently has been having some sexual type behavior with his roommate. Today, he was noted to be kind of rowdy out in the hall and had to be seen pretty quickly. I'm told that he destroys his roommate's property and other people's property. Fights with the patients in his cottage." (*Id*. at 10).

- "[C]ontinues to be fairly disruptive and aggressive. He will attack other patients. He doesn't fight with the staff. He gets into his roommates belongings and destroys them. The last two weeks he has been making sexual allegations about his roommate who in return makes them about him." (*Id*. at 11).

- "[S]eems to be doing much better. His rates of physical aggression dropped from 38 in June to 5 in August and his rates of disruptive behavior dropped from 103 in June to 25 in August." (*Id*. at 12).

- "[H]as settled down quite nicely. He has had zero incidents of severe physical aggression and disruptive behavior. I am told though that he will get loud, slam doors, curse and occasionally slap, but this seems to be at a low rate." (*Id*. at 13).

- "[H]as had seven episodes of physical aggression in December and six in January. Over the Christmas holidays, he got mad at home and staff had to go pick him up." (*Id*. at 14).

- "[C]ontinues to rock along with episodes of disruptive and aggressive behavior. He is very impatient. He runs out of the apartment from time to time. Breaks and throws things when he is upset." (*Id*. at 16).

In order to combat these tendencies, Plaintiff was prescribed Depakote ER for behavioral control, Aripiprazole for aggression, and Inderal LA for his "aggressive explosive outbursts." (*Id*. at 7-16).

In Dr. Baltz's March 17, 2005 report, he expressed his doubts about Plaintiff's ability to make "medical, surgical, financial, or placement decisions." (*Id*. at 15). Consistent with this finding, he executed an affidavit in support of the appointment of a guardian for Plaintiff. (Docs. # 46-4 at 4; 46-5). On April 12, 2005, Plaintiff's mother, Polly Robinson, was appointed his guardian. (*Id*. at 6-7).

### B. Plaintiff's Roommate at Partlow, R.G.

R.G. was admitted to Partlow on October 5, 2004 with a prior diagnosis of Cerebral Palsy and mild to moderate mental retardation. (Docs. # 46-3 at 2-3; 46-6 at 1-3). R.G. has never been able to walk and is confined to a wheelchair. (Doc. # 46-3 at 2). According to his individual support plan documented on November 20, 2007, he had an IQ of 40 and his target behaviors were "physical aggression" and "throwing feces." (*Id*. at 3; *Id*.). As to his history of physical aggression, R.G. would sometimes "hit other employees," "grab the hair of some of the workers at Partlow," "[throw] things at the employees at Partlow," and "[grab] or hit the other people who lived there." (Doc. # 46-9 at 21-22). In fact, the employees at Partlow were required to "[a]lways position [themselves] between [R.G.] and other clients." (Doc. # 46-10 at 1).

During April 2005, R.G. lived at Partlow in Apartment 10B with Plaintiff. (Docs. # 41-3 at 14; 46-1 at 4). In comparing the physical makeup of these two clients during that month,

Plaintiff was 34 years old, six feet tall, and weighed 195 pounds. (Doc. # 46-2 at 3). R.G., on the other hand, was 24 years old and weighed between 246 and 271 pounds. (Doc. # 46-3 at 2-3). The Rule 56 record shows that Plaintiff did not like his roommate. (*Id*. at 17; *Id*. at 5).

### C. Perry Walker's Employment Record and His Role on April 2, 2005

From November 5, 2001 to April 7, 2005, Perry Walker was employed by ADMH as a Mental Health Worker I at Partlow. (Doc. # 39-2 at 1). His duties included assuring client safety, interacting and intervening with clients, performing light housekeeping, escorting clients, recording/reporting information in a timely manner, performing personal care activities and minor treatments, and monitoring and reporting client physical, behavioral, and personal issues. (Doc. # 46-15 at 1, 8).

Walker, and other ADMH employees, were also trained (both upon employment and annually) on the Department Policies. (Doc. # 46-12 at 5). Department Policy 19-10 provides:

> Any form of client abuse, neglect, exploitation or mistreatment will not be tolerated. The DMH will immediately investigate and provide for appropriate legal and administrative actions based upon such investigation in any state-operated facility.

(Doc. # 46-13 at 1). Department Policy 19-25 also imposes a duty to report on ADMH employees:

> In accordance with state law, the Department of Mental Health and Mental Retardation (DMH/MR) shall report to the Department of Human Resources (DHR) cases of abuse, neglect, or exploitation involving persons receiving services in state operated DMH/MR residential facilities (with the exception of psychiatric nursing home(s)) when there is reasonable cause to suspect that abuse, neglect, or exploitation has occurred.

(Doc. # 46-14 at 1). Abuse is defined as "the willful infliction of physical pain, injury, or mental anguish or the willful deprivation of services necessary to maintain mental and physical health." (*Id*.). Neglect is "the failure to provide basic needs such as food, clothing, medical treatment, and

shelter." (*Id*.). Finally, exploitation is defined as "an unjust or improper use of another person or another person's resources for one's own profit or advantage or for the profit or advantage of another person." (*Id*.).

From 2001 to 2003, Walker's performance record reflected adequate "meets standards" scores. (Doc. # 46-15 at 1-6). However, on February 5, 2004, Walker allegedly physically abused a client at Partlow. (*Id*. at 15). The client suffered "a quarter-sized hematoma to the forehead and an abrasion to the right fourth finger." (*Id*.). Following an investigation and a pre-disciplinary conference held February 24, 2004, the Facility Director suspended Walker for three weeks for violating Department Policy 19-10, "Reporting and Investigating Abuse, Neglect, Mistreatment, and Exploitation." (*Id*. at 14) (referenced above). The suspension was effective for the period of March 6, 2004 to March 29, 2004. (*Id*.).

Walker worked with Plaintiff's roommate frequently; indeed, R.G. saw him every day. (Doc. # 46-9 at 23). On April 2, 2005, Walker was the Mental Health Worker assigned to R.G. (Doc. # 1 at ¶ 18). The incident arose because R.G. was upset and did not want his diaper changed, so he began throwing feces at Walker and Plaintiff. (Docs. # 46-1 at 8; 39-1 at 8). Only these three individuals were in the room at the time. (*Id*.). In response, Walker instructed Plaintiff to hit his roommate on the head with a radio, and Plaintiff did so.[4] (*Id*. at 5; *Id*. at 5). Plaintiff claims that Walker said, "Wayne, hit [R.G.] in the head." (*Id*. at 7; *Id*. at 7). "Then he told [Plaintiff] to do it again." (*Id*.). Plaintiff testified that he hit his roommate because of Walker's instruction, but also because he was upset R.G. was throwing feces at him. (*Id*. at 8, 12; *Id*. at 8, 12). Plaintiff claims that when he hit his roommate, "[his] heart was pounding" in his chest. (Doc. # 46-1 at 12; 39-1 at 12). His mother testified that he still gets "upset" and

---

[4] R.G. testified that while he didn't see who hit him in the head, he thinks it was Perry Walker. (Docs. # 46-9 at 23; 11 at 1). He suffered a laceration on the side of his head as well as a swollen eye. (Doc. # 46-11 at 1-2).

sometimes cries talking about the incident. (Doc. # 46-16 at 4-5). She further testified that Walker offered Plaintiff a Coke to hit R.G., and Plaintiff "always wanted Cokes." (*Id*. at 4, 12).

Both Plaintiff and R.G. testified that they reported the incident to other Mental Health Workers at Partlow. (Docs. # 46-1 at 7-8; 46-11 at 26). On April 4, 2005, ADMH placed Walker on mandatory leave while it conducted an investigation. (Docs. # 46-15 at 13; 39-2 at 2). ADMH did not discipline or terminate Walker because he resigned on April 7, 2005. (*Id*. at 12; 39-3). Later that same year, Walker passed away. (Doc. # 1 at ¶ 9).

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of*

*Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one

party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.     Analysis

After careful review, and for the reasons explained below, the court concludes that ADMH's motion for summary judgment is due to be granted, while the Estate's motion is due to be granted in part and denied in part.

### A.  Plaintiff's Section 1983 Claim Against the Estate

Title 42 U.S.C. § 1983 provides a cause of action against persons who, while acting under color of law, deprive another person of any right established by the Constitution. Plaintiff asserts that when Walker (while acting as an employee of ADMH) instructed Plaintiff to hit his roommate with the radio, he deprived Plaintiff of his "right to be free from mental or physical abuse and his right to reasonably safe conditions of confinement" under the due process clause of the Fourteenth Amendment. (Doc. # 47 at 11).

The Supreme Court in *Youngberg v. Romeo* first considered the substantive due process rights of the civilly committed under the Fourteenth Amendment. The Court established a mental patient's right to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and minimally adequate training to ensure safety and freedom from restraint. 57 U.S. 307, 316-20 (1982). When an individual becomes institutionalized, he becomes "wholly dependent on the State." *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 200 (1989). This dependence triggers the State's affirmative duty to protect and provide reasonably safe conditions for the institutionalized. *Id*. In comparing a State's related duty to

hold convicted criminals in safe conditions, *Youngberg* confirmed that "[p]ersons who have been involuntarily[5] committed are entitled to more considerate treatment and conditions of confinement that criminals whose conditions of confinement are destined to punish." *Id.* at 321-22 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

In the wake of *Youngberg*, circuit courts have disagreed over the appropriate standard for measuring the substantive due process rights of the civilly committed. Two competing tests have emerged: the professional judgment standard announced in *Youngberg* and the Eighth Amendment deliberate indifference standard. Plaintiff argues that Walker is liable under both standards. (Doc. # 54 at 2-5). While there may be room for the argument that something other than deliberate indifference applies to Plaintiff's Section 1983 claim, the Eleventh Circuit has stated that the substantive due process rights of the civilly committed are *at least as extensive* as the Eighth Amendment rights of the criminally institutionalized. *See Lavender v. Kearney*, 206 F. App'x 860, 863 (11th Cir. 2006). Accordingly, out of an abundance of caution, the court first examines the professional judgment standard and concludes that it does not apply to Walker, a non-professional. The court then applies the deliberate indifference standard to Walker's conduct and, after doing so, finds sufficient Rule 56 evidence for Plaintiff to proceed to trial on his Section 1983 claim.

### i. The Professional Judgment Standard

In a unanimous decision, the *Youngberg* Court determined that a "decision, if made by a professional [defendant], is presumptively valid." *Id.* at 323. "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional

---

[5] Whether Plaintiff was voluntarily or involuntarily confined at Partlow does not change the due process protections afforded to him. *See Wyatt v. Poundstone*, 892 F. Supp. 1410, 1421 n. 65 (M.D. Ala. 1995) (citing *Doe v. Public Health Trust of Dade County*, 696 F.2d 901, 903 n. 10 (11th Cir. 1983)).

judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*. The Court defined a professional decision maker as "a person competent, whether by education, training or experience, to make the particular decision at issue." *Id*. at 323 n. 30. The Court drew a distinction between (1) "persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded," who are typically responsible for "[l]ong-term treatment decisions," and (2) "employees without formal training but who are subject to the supervision of qualified persons," and who normally make "day-to-day decisions regarding care." *Id*.

However, the Court did not discuss what standard applied to *non*professional defendants.[6] This omission suggests that nonprofessionals who allegedly violated the substantive due process rights of the civilly committed are subject to an entirely different standard of liability than professionals. In fact, this uncertainty has led circuits which recognize the professional/nonprofessional distinction to default to the deliberate indifference standard in cases where the conduct of nonprofessionals is called into question. For example, the Third Circuit in *Shaw v. Strackhouse* held that "nonprofessional employees who provide care for involuntarily institutionalized mentally retarded individuals are subject even after *Youngberg*, only to a deliberate indifference standard." 920 F.2d 1135, 1147 (3rd Cir. 1990) (applying the professional judgment standard to a mental facility's superintendent, assistant superintendent, program coordinator, unit manager, recreation director, occupational therapist, and other professionals, but applying the deliberate indifference standard to nonprofessional residential service aids); *accord Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008).

---

[6] At issue in *Youngberg* were the decisions of the facility director and two supervisors, all of whom had substantial supervisory authority. *Id*. at 310 n. 3.

In *Kyle K v. Chapman*, the Eleventh Circuit defined nonprofessional decision makers as "direct care workers whose primary responsibility [was] carrying out the directions of the officials who determine patient care." 208 F.3d 940, 944 (11th Cir. 2000) (holding that nonprofessional defendants were entitled to qualified immunity on Section 1983 claim because plaintiffs had cited no case were "non-professionals…were held to have violated the rights alleged"). Walker's job as a Mental Health Worker at Partlow bears a strong similarity to the direct care workers in *Kyle K* and the residential service aids in *Shaw*. His duties included assuring client safety, interacting and intervening with clients, performing light housekeeping, escorting clients, recording/reporting information in a timely manner, performing personal care activities and minor treatments, and monitoring and reporting client physical, behavioral, and personal issues. (Doc. # 46-15 at 1, 8). Nothing in the Rule 56 record indicates that any of Walker's duties involved the type of discretion associated with the exercise professional judgment. Thus, the professional judgment standard does not apply to Walker because he was not a "professional" or a "decision maker." Instead, as demonstrated by the Third and Sixth Circuits, Walker's status as a nonprofessional subjects him to the deliberate indifference standard.

### ii. The Deliberate Indifference Standard

The Eleventh Circuit has not articulated any standard less than deliberate indifference for Section 1983 claims brought by the civilly committed. *See Lavender*, 206 F. App'x at 863 (civil commitment resident at a state-run facility was attacked by a fellow resident and brought a Section 1983 claim against facility officials, arguing they had violated his *Youngberg* due process rights because they were actually aware of a substantial risk to his safety). *Lavender* determined that "the due process rights of the involuntarily civilly committed *are at least as*

*extensive* as the Eighth Amendment 'rights of the criminally institutionalized.'" *Id.* (quoting *Dolihite v. Maughon,* 74 F.3d 1027, 1041 (11th Cir.1996)) (emphasis added). Indeed, the relationship between these groups of rights is so intertwined that "relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." *Dolihite v. Maughon,* 74 F.3d 1027, 1041 (11th Cir.1996). "Accordingly, for an involuntarily civilly-committed plaintiff to establish a Section 1983 claim for violation of his due process rights, he must show that state officials were deliberately indifferent to a substantial risk to his safety." *Lavender*, 206 Fed. Appx. at 863 (quoting *Purcell v. Toombs County, GA,* 400 F.3d 1313, 1319 (11th Cir.2005)). Consistent with this precedent, the court applies the deliberate indifferent standard to Walker's conduct.

To establish deliberate indifference, Plaintiff must show that Walker "'(1) was objectively aware of a risk of serious harm; (2) recklessly disregarded the risk of harm; and (3) [that] this conduct was more than merely negligent.'" *Id.* (quoting *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir.1999)). More specifically, Plaintiff must show that Walker disregarded "a risk of harm of which he [was] *actually* aware." *Id.* (quoting *Ray v. Foltz*, 370 F.3d 1079, 1083 (11th Cir. 2004)).

Plaintiff asserts that "there is no requirement that Walker's conduct 'shock[] the conscience." (Doc. # 47 at 25-27). But, the Eleventh Circuit has confirmed that "conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992)). While "the measure of what is conscience-shocking is no calibrated yard-stick," it is "only the most egregious official conduct [that] can be said to be

arbitrary in the constitutional sense." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 847 (1998)).

Although it is a close call, the court finds sufficient Rule 56 evidence to support Plaintiff's claim that Walker was deliberately indifferent to a substantial risk to his safety. Plaintiff primarily argues that "[b]eing the instrumentality of that injury was foreseeably psychologically traumatic to [him], and also placed [him] at substantial risk of injury from a patient who outweighed him significantly, was 10 years younger, and had a documented history of physical aggression." (Doc. # 47 at 13). In addition to the risks of physical and psychological injury, Plaintiff asserts that Walker's conduct also (1) presented Plaintiff with a risk of disease through increased contact with his roommate's feces[7] and (2) threatened the success of his treatment process, his personal freedom, and his ability to leave the institution. (Doc. # 54 at 6-10). For the reasons explained below, the court finds that there are material facts that support Plaintiff's claim.

First, as the Mental Health Worker assigned to R.G., Walker would have been objectively aware of a serious risk of harm to Plaintiff's safety due to R.G.'s documented record of physical aggression. Whether a "substantial risk of serious harm" exists is an objective standard. *Purcell v. Toombs County, GA*, 400 F.3d 1313, 1323 (11h Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (stating that alleged deprivation must be "objectively, sufficiently serious")). To be sure, one of R.G.'s target behaviors was physical aggression. (Doc. # 46-3 at

---

[7] Plaintiff argues, in part, that Walker ignored a substantial risk to Plaintiff's health by inciting him to assault his roommate because he was at a greater risk of fecal exposure. *See Brooks v. Warden*, 800 F.3d 1295, 1304 (11th Cir. 2015) (holding that plaintiff had "sufficiently alleged a substantial risk of serious harm, as the health risks of *prolonged* exposure to human excrement are obvious") (emphasis added). First, nothing in the Rule 56 record indicates that Plaintiff was forced to spend a prolonged period of time exposed to his roommate's feces without the opportunity to clean himself. Momentary exposure is not enough to show a substantial risk of harm. Second, the record indicates that his roommate was already throwing feces in the room before Walker intervened (and had done so on multiple prior occasions). The court cannot say on this record that Walker's actions did not add to the risk of momentary exposure he already experienced, or indeed, had experienced in his daily life as R.G.'s roommate.

3). R.G. would sometimes "hit other employees," "grab the hair of some of the workers at Partlow," "[throw] things at the employees at Partlow," and "[grab] or hit the other people who lived there." (Doc. # 46-9 at 21-22). In fact, the employees at Partlow were required to "[a]lways position [themselves] between [R.G.] and other clients." (Doc. # 46-10 at 1). Walker also would have observed that R.G. "outweighed [Plaintiff] significantly" and was ten years younger. (Doc. # 47 at 13; 46-3 at 2-3). Compounded with the fact that Plaintiff was also receiving treatment for his disruptive and aggressive outbursts, there is sufficient Rule 56 evidence for a jury to determine that Walker was objectively aware of a substantial risk of harm to Plaintiff's safety when he incited a potential conflict between two patients with histories of physical aggression.

As to the second and third elements of the deliberate indifference test, a jury could reasonably conclude that Walker recklessly disregarded the objective, substantial risk to Plaintiff's physical safety because he set the attack in motion by giving Plaintiff the instruction to strike his roommate (and a jury could conclude that this was to avoid getting involved with R.G. himself). "Deliberate indifference is shown by establishing that the defendant had actual knowledge or awareness of an obvious risk to the plaintiff and failed to take steps to abate that risk." *Felder v. Ala. Dep't of Corr.*, 2016 WL 3763232, at \*5 (M.D. Ala. June 9, 2016). Here, the Rule 56 evidence indicates that not only did Walker fail to take steps to abate the substantial risk to Plaintiff of which he was actually aware, but he intentionally created that risk. Under the proper standard, a mere showing of negligence will not establish liability under Section 1983. *Lavender*, 206 Fed. Appx. at 863. Walker's instruction to Plaintiff to hit R.G. suggests a level of intentionality far surpassing negligence.

Moreover, a jury could reasonably find Walker's conduct to be conscience shocking in a constitutional sense. *Waddell*, 329 F.3d at 1305. Again, what is considered "conscience

shocking" is "no calibrated yard-stick." *Id*. But, "[t]he conscience-shocking threshold is more quickly reached in cases where the victim is particularly vulnerable to abuse and is otherwise defenseless." *M.S. ex rel. Soltys v. Seminole Cty. Sch. Bd.*, 636 F. Supp. 2d 1317, 1323 (M.D. Fla. 2009) (considering a teacher's allegedly abusive conduct against children with preexisting mental and emotional disabilities). Walker instructed one mentally retarded individual to strike another with a radio, presumably to avoid getting involved in the disturbance himself. As a result, the Rule 56 record at least creates a genuine issue of material fact about whether Walker's conduct was conscience shocking.

The court fully recognizes that the primary risk of physical harm in this situation was to Plaintiff's roommate. After all, his roommate was the victim of the assault inflicted by Plaintiff. And, it is important to note that Plaintiff suffered no physical harm following Walker's instruction. (Doc. # 46-1 at 12). In fact, the only physical effect Plaintiff alleges is "[his] heart was pounding when [he] hit [his roommate]." (*Id*.). Apart from that claim, Plaintiff offers only an explanation of the physical harm that *could* have befallen him had his roommate decided to retaliate: "Assault in the head with a blunt instrument is substantially certain to cause serious injury, including brain damage, a fractured skull, or even death." (Doc. # 47 at 12-13). Other circuits have suggested that the assertion of a hypothetical risk of injury, without evidence that the risk actually materialized, is insufficient to justify liability under Section 1983. *See Saunders v. Tourville*, 97 Fed. Appx. 648, 649 (7th Cir. 2004) ("an inmate who suffers only a risk of physical harm has no compensable claim under the Eighth Amendment"). Nevertheless, the court is mindful that the deliberate indifference standard only calls for a substantial *risk*. Thus, it is at least possible for a jury to find that Walker was deliberately indifferent to a substantial *risk* to Plaintiff's physical safety.

For the reasons explained above, the Estate's motion for summary judgment is due to be denied with respect to Plaintiff's Section 1983 claim in Count One of the Complaint. As noted above, the Eleventh Circuit has stated in *Lavender* that the substantive due process rights of the civilly committed are *at least* as extensive as the Eighth Amendment rights of the criminally institutionalized. 206 F. App'x at 863. Although the Eleventh Circuit has not yet defined a lower standard for the civilly institutionalized, it may in the future. But here, the court need not venture a guess as to whether our Circuit will do so (or, for that matter, what the new standard would be). That is because the court finds that there is sufficient Rule 56 evidence for Plaintiff to avoid the swing of the Estate's summary judgment axe. The court will discuss this claim further with the parties during pretrial proceedings.

### B.  Plaintiff's ADA and Rehabilitation Act Claims Against ADMH

In Counts Two and Eight of his Complaint, Plaintiff asserts violations of Section 504 of the Rehabilitation Act and Title II of the ADA under the theories of discrimination and harassment. (Doc. # 1 at ¶¶ 34-49, 71-74). Because the two statutes have overlapping standards of proof, the two are often analyzed together. *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability…shall, solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." *See* 29 U.S.C. § 794(a). Similarly, Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To establish discrimination under either statute, a plaintiff must show "(1) that he is a

qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

Here, there is no dispute that Warren is "disabled" as defined by both statutes, that ADMH is the recipient of federal funds as required by the Rehabilitation Act, or that ADMH is considered a "public accommodation" under the ADA. (Docs. # 46 at 15; 41 at 8). Rather, ADMH argues that Plaintiff has not presented substantial evidence indicating that he has suffered any denial of equal treatment, exclusion from programs, or other form of discrimination *on the basis* of his disability. (Docs. # 41 at 9, 14; 50 at 9). The court agrees and finds that ADMH is entitled to summary judgment on Counts Two and Eight.

### i. ADMH is Due to be Granted Summary Judgment on Plaintiff's Claim under Section 504 of the Rehabilitation Act.

Plaintiff argues that "ADMH deprived [Plaintiff] of the benefit of his treatment for physical aggression" by exposing him to Walker, a mental health worker with a known history of patient assault, despite the Facility Director's knowledge of Walker's history. (Doc. # 46 at 29). An element of Plaintiff's burden is showing that ADMH intended to discriminate against Plaintiff on the basis of his disability. In accessing a Section 504 claim under the Rehabilitation Act, Plaintiff asserts that deliberate indifference is the appropriate standard for defining intentional discrimination. (*Id*. at 22) (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 347-48 (11th Cir. 2012).

Within the context of the Rehabilitation Act, the Eleventh Circuit has identified deliberate indifference where "the defendant *knew* that harm to a federally protected right was

substantially likely and ... *failed* to act on that likelihood." *Leise*, 701 F.3d at 344. Deliberate indifference requires something more than gross negligence; it requires that the "indifference be a deliberate choice." *Id.*

According to *Liese*, Title IX case law examining discriminatory intent under the deliberate indifference standard is instructive. *Id.* (citing *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998)). In determining organizational liability, the court looked to *Gebser*, which requires "the deliberate indifference of 'an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the [organization's] behalf [and who] has *actual knowledge* of discrimination in the [organization's] programs and fails to adequately respond." *Id.* at 349 (quoting *Gebser*, 524 U.S. at 290) (emphasis in original). The court further defined an "official" as "someone who enjoys substantial authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Id.* at 350 (quoting *Doe v. Sch. Bd. of Broward Cnty., Fla.,* 604 F.3d 1248, 1256-57 (11th Cir.2010)). The "key decision point" language ensures that review by a higher authority is "not part of the entity's ordinary decision-making process." *Id.*

Defendant incorrectly argues that Plaintiff has failed to identify an "'official' who is vested with 'substantial supervisory authority within an organization's chain of command.'" (Doc. # 50 at 8). To the contrary, Plaintiff points to Facility Director Levi Harris who issued Walker his letter notifying him of his three-week suspension following the allegation of patient abuse levied against him in February 2004. (Docs. # 46 at 24; 46-15 at 14). The Facility Director of Partlow is surely an individual "who enjoys substantial authority" within ADMH's "chain of command" with respect to Partlow. *See Liese*, 701 F.3d at 350. Harris also likely had "complete

discretion at a 'key decision point'" in the disciplinary process. *Id*. In the suspension letter issued to Walker, Harris states, "After carefully considering all information presented during your pre-disciplinary conference…as well as considering information provided during a follow-up conference with you it is my decision to suspend you for three weeks in lieu of dismissal based on your violation of DMH/MR Policy # 19-10." (Doc. # 46-15 at 14). Harris had already conducted two preliminary forms of review before making the decision to suspend Walker, suggesting that this was the key decision point in the administrative process. Indeed, review from a higher authority was not contemplated because a final determination by the Facility Director is the highest form of review. Thus, Plaintiff has identified an official vested with substantial supervisory authority.[8]

Plaintiff's claim nevertheless fails because he has presented no facts indicating that ADMH's choice to allow Walker to return to work was solely because of Plaintiff's disability. Even if ADMH's choice to retain Walker's employment despite his history of patient abuse did ultimately impact Plaintiff's treatment for his aggression (and, to be clear, Plaintiff has not presented substantial evidence that it did), Plaintiff cannot show that ADMH did so on the basis of Plaintiff's disability. Discrimination under Section 504 of the Rehabilitation Act requires some intent on the part of the Defendant. While it is true that termination is the recommended disciplinary action under Policy # 19-10 (Doc. # 46-13 at 2), it is not sufficient to allege (as Plaintiff has here) that ADMH's actions were ill-advised or were against the Department's policies. Rather, Plaintiff must show that ADMH acted with the mindset of depriving Plaintiff

---

[8] It is unclear whether Plaintiff also argues that Walker's conduct itself constituted disability-based discrimination directly attributable to ADMH. (Doc. # 46 at 20-21). To be clear, such an argument would also miss the mark. *Leise* defined liability under Section 504 as the "deliberate indifference of someone who can fairly be said to represent the actions of the organization." 701 F.3d at 350. Walker, a Mental Health Worker at Partlow, was not an "official" who enjoyed supervisory authority within ADMH's chain of command. His actions cannot represent the organization as a whole. ADMH's actions, *i.e.*, the actions of its officials, are the proper subject of the court's inquiry, not Walker's.

the benefit of his treatment plan. *See Liese*, 701 F.3d at 344 (explaining that the indifference must be a "deliberate choice"). Because no reasonable jury could conclude that ADMH intentionally deprived Plaintiff of the benefit of his treatment for physical aggression by allowing Walker to return to work, ADMH is entitled to summary judgment.

Furthermore, to the extent that Plaintiff may be asserting that ADMH failed to prevent the incident in this case, that argument is also without merit. Again, Plaintiff must show *that ADMH* was deliberately indifferent, meaning that it "knew that harm to a federally protected right was substantially likely and…failed to act on that likelihood." *Leise*, 701 F.3d at 344. There is simply no Rule 56 facts showing that ADMH failed to act. After Walker's prior misconduct, ADMH suspended him for three weeks. (Doc. # 46-15 at 14). But even more critically, "it cannot be said that [ADMH was] deliberately indifferent because [it] did not make a deliberate choice not to take any action." *L.L. ex rel. Linda L. v. Tuscaloosa City Bd. of Educ.*, 2013 WL 169612, at *7 (N.D. Ala. Jan. 15, 2013). ADMH is due to be granted summary judgment on this claim.

### ii. ADMH is Due to be Granted Summary Judgment on Plaintiff's Harassment Claim

In his Complaint, Plaintiff alleges that he was "subjected to unlawful harassment by Walker, an employee of ADMH." (Doc. # 1 at ¶ 71). He does not, however, argue in support of this claim in his Response to ADMH's Motion for Summary Judgment. Plaintiff cannot simply rely on his Complaint to create a jury question. *See Anderson*, 477 U.S. at 252. Rather, he must come forward with some factual evidence indicating that ADMH performed some intentional action constituting harassment solely because of Plaintiff's disability. No reasonable jury could find in favor of Plaintiff on his harassment claim. Consequently, ADMH is due to be granted summary judgment on this claim.

### C. State Law Claims Against the Estate

Plaintiff next asserts various state law claims against the Estate, including the tort of outrage, assault, negligence, and wantonness. (Doc. # 1). Additionally, Plaintiff alleges three other claims disguising different theories of negligence as independent causes of action: Noncompliance with Ministerial Duties (Count Three); Combining and Concurring (Count Four); and Violations of Nondiscretionary Rules (Count Five). (*Id.*). The Estate seeks summary judgment on each of these causes of action because they do not state actionable claims under Alabama law. (Doc. # 39 at 9-11). The court agrees and concludes summary judgment in favor of the Estate on Counts Three, Four, and Five is proper.

In Count Three for "Noncompliance with Ministerial Duties," Plaintiff alleges that Walker "negligently and/or wantonly failed to follow [the] policies and procedures [of the Department]" and "failed to use due care in carrying out his responsibilities." (Doc. # 1 at ¶ 51). As a result, Walker's conduct allegedly "constituted violations of ministerial rather than discretionary duties." (*Id.*). But, the Estate correctly argues that "Noncompliance with Ministerial Duties" is not a "cognizable claim under Alabama law." (Doc. # 39 at 10; Doc. # 39-4 at 41). In support of its argument, the Estate cites *Harris v. Gurley*, which noted that "there is no authority to support the proposition that Alabama recognizes an affirmative cause of action for noncompliance with ministerial duties and checklists." 2010 WL 11613800, at *19 (N.D. Ala. March 25, 2010). Thus, the Estate is entitled to summary judgment on the claim in Count Three.

Similarly, the claim asserted in Count Four for "Combining and Concurring" fails to state a claim recognized under Alabama law. Plaintiff alleges that the actions of all Defendants "combined and concurred to cause [him] harm." (Doc. # 1 at ¶ 58). While the court

acknowledges "combining and concurring" as a theory of negligence liability commonly given in a jury instruction, it finds no authority supporting its viability as an independent cause of action. Accordingly, the court finds the Estate is entitled to summary judgment on Count Four.

Plaintiff's claim in Count Five for "Violations of Nondiscretionary Rules" suffers the same fate. Plaintiff states that "Walker violated ADMH rules and regulations when he abused, exploited, and mistreated [Plaintiff]. He also violated rules and regulations by failing to report his abuse." (*Id*. at ¶ 63). Again, the court is unable to find any law confirming that "Violations of Nondiscretionary Rules" is a recognized cause of action in the state of Alabama; therefore, the Estate is entitled to summary judgment.

Furthermore, two statements in Plaintiff's opposition brief appear to impliedly concede that the theories asserted in Counts Three, Four, and Five are encompassed in his claims for "assault, negligence, wantonness, and outrageous conduct." (Doc. # 47 at 8). (1) "[T]he motion for summary judgment analysis is much more direct: did Walker's conduct, as alleged and supported in the attached record, amount to assault, negligence, wantonness, and outrage under state law." (*Id*. at 28). (2) "A fair reading of the Complaint gave Walker full notice that he was being sued for violating 42 U.S. § 1983, negligence, wantonness, assault and outrage." (*Id*. at 29). Plaintiff simply has not presented any Rule 56 evidence indicating that Noncompliance with Ministerial Duties, Combining and Concurring, or Violations of Nondiscretionary Rules are independent causes of action under Alabama law or that they were intended to function as stand alone claims in his Complaint. Because Counts Three, Four, and Five of Plaintiff's Complaint do not state actionable claims against Walker, the Estate is entitled to summary judgment on these claims.

### i. The Estate is Due Summary Judgment on Plaintiff's Tort of Outrage Claim

In Count Six, Plaintiff alleges that Walker's conduct in instructing him to hit his roommate was "so atrocious as to be outside the bounds of common decency in a civilized society."[9] (Doc. # 1 at ¶ 63). To state a claim for the tort of outrage, or intentional infliction of emotional distress, Plaintiff must demonstrate that Walker's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Wilson v. Univ. of Alabama Health Servs. Found., P.C.*, No. 1160654, 2017 WL 6397654, at *2 (Ala. Dec. 15, 2017) (citing *Green Tree Acceptance, Inc. v. Standridge*, 565 So.2d 38, 44 (Ala. 1990)). Furthermore, the conduct must "be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id*.

The Estate first contends that Plaintiff has presented no evidence that Walker acted "intentionally or recklessly" in that he "intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct." (Doc. # 39 at 12) (citing *Harris v. McDavid*, 553 So. 2d 567, 569-70 (Ala. 1989). Second, the Estate argues that Plaintiff has failed to allege "emotional distress of such a magnitude that no reasonable person could be expected to endure it." (Doc. # 39 at 12). Finally, it insists that Walker's conduct is not sufficiently outrageous to establish a tort of outrage claim. (*Id*. at 13). The court agrees and grants summary judgment in favor of the Estate.

---

[9] In his Response brief, Plaintiff exaggerates the facts far beyond the bounds of the Rule 56 record: "Walker's instruction to two mentally ill patients with a history of physical aggression to *beat one another senseless with deadly force* and a blunt instrument is outrageous by any measure…conduct that would be outrageous if it took place *in a pit for fighting dogs* is all the more reprehensible [within] the environment of a hospital for the care of the mentally disabled." (Doc. # 47 at 30) (emphasis added). The court, by no means, condones Walker's conduct. However, there is no evidence in the record that Walker encouraged both Plaintiff and his roommate to attack each other with the aim to seriously injure or even kill. The court understands the desire to zealously represent one's client, but Plaintiff's characterization of the facts in this instance is baseless exaggeration.

As to the first element, Plaintiff has provided the court with no Rule 56 evidence indicating that Walker intentionally or recklessly acted with the purpose of inflicting emotional harm *on Plaintiff*. Instead, Plaintiff points to a list of Department policies that Walker supposedly violated as well as Partlow's alleged history of staff-brutality. (Doc. # 47 at 31). But these have no bearing on whether Walker possessed the intent to cause severe emotional distress. Even if Walker knew his actions were in violation of Department policies, it does not necessarily follow that he knew (and intended) those violations would cause Plaintiff to suffer severe emotional distress. Moreover, Plaintiff has not suggested that any pattern of staff-brutality that may have existed at Partlow prior to the events giving rise to this case influenced Walker's intent with respect to Plaintiff. Thus, Plaintiff has not demonstrated that Walker acted recklessly or with the intent to inflict severe emotional distress upon him.[10]

Second, Walker's conduct, though ridiculous (and possibly deliberately indifferent), was not "extreme and outrageous" as defined by Alabama law on the tort of outrage. The tort of outrage is a highly focused cause of action, meaning that it "does not recognize recovery for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011) (quoting *American Road Service Co. v. Inmon*, 394 So. 2d 361, 364-65 (Ala. 1980)). Typically, Alabama courts have limited its application to three contexts: "(1) wrongful conduct in the family-burial context, *Whitt v. Hulsey,* 519 So.2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen,* 447 So.2d 133 (Ala.1983); and (3) egregious sexual harassment, *Busby v.*

---

[10] This determination is not inconsistent with the court's earlier finding that a jury could reasonably conclude that Walker was deliberately indifferent to a substantial risk to Plaintiff's physical safety. That finding was based upon Walker's objective awareness of Plaintiff's and R.G.'s documented histories of physical aggression. Despite this awareness, Walker instructed Plaintiff to put himself in a position of danger by hitting his roommate, who was perhaps likely to retaliate. The Rule 56 record does not support a similar finding that Walker intentionally or recklessly acted with the purpose of inflicting severe emotional harm on Plaintiff.

*Truswal Sys. Corp.,* 551 So.2d 322 (Ala.1989)." *Little*, 72 So. 3d at 1172. However, the Supreme Court of Alabama has recently explained that the tort of outrage applies "against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction." *Id.* at 1173 (citing *O'Rear v. B.H.,* 69 So.3d 106 (Ala. 2011)). The court reads *O'Rear* as a logical extension of cases like *Busby*, involving egregious sexual harassment executed with the purpose of inflicting severe emotional harm. Viewing the Rule 56 record within these narrowly defined categories, Walker's conduct simply does not approach the high threshold for liability contemplated by the tort.[11]

Another significant failing in Plaintiff's tort of outrage claim is that he did not suffer "emotional distress so severe that no reasonable person could be expected to endure it." Plaintiff has only established that "[his] heart was pounding when [he] hit him." (Doc. # 46-1 at 12; 39-1 at 12). In terms of lasting effects, Plaintiff to this day gets "upset" and sometimes cries talking about the incident (*Id.*) He still tells his mother, "I feel sorry that I hit [R.G.]." (Doc. # 46-16 at 5, 28). At most, Plaintiff has expressed guilt about the event. Because Plaintiff cannot show a genuine issue of material fact regarding his tort of outrage claim, the Estate is entitled to summary judgment.

### ii.  The Estate is Due Summary Judgment on Plaintiff's Assault Claim

Plaintiff alleges that "Walker physically assaulted [him], mistreated him and exploited him by instructing him to assault another mental health patient." (Doc. # 1 at ¶ 69).  In support of this allegation, Plaintiff presents the court with an Alabama criminal statute stating that "[a] person is legally accountable for the behavior of another involving a criminal offense if the

---

[11] The court reaches this conclusion based upon a commonsense application of state law. For example, even if Walker had directed Plaintiff to hit himself (rather than R.G.) with the clock radio, that would not state a claim for outrage under Alabama law.

person 'procures, induces or causes' the other person to commit the offense or 'aids or abets' the other person in committing the offense." (Doc. # 47 at 32; Ala. Code. § 13A-2-23 (1975)). This is a civil case. Because no criminal charges are at issue, this statute is irrelevant.

The proper definition of assault in a civil case is "an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Western Union Tel. Co. v. Hill*, 150 So. 709 (Ala. Ct. App. 1933). Words cannot constitute an assault, unless those words are paired with some show of force leading the victim to believe the threat will be carried out. *Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1438, 1459 (M.D. Ala. 1996) (citing *Ex parte Hammett,* 66 So.2d 600, 601 (1953)).

Here, Plaintiff has not produced facts indicating a genuine dispute as to whether Plaintiff was assaulted. The facts clearly indicate that Walker gave Plaintiff a verbal instruction to hit his roommate on the head with a radio—nothing more.[12] (Doc. # 46-1 at 11-12). No threat of an offensive touching was made to Plaintiff such that he would have feared an immediate battery if he did not comply with Walker's instruction. Based upon the evidence in the Rule 56 record, the court determines that a reasonable jury could not find that Walker assaulted Plaintiff. Therefore, the Estate is entitled to summary judgment on Count Seven.

### iii. The Rule 56 Record Supports Plaintiff's Claim that Walker Acted Wantonly in His Care of Plaintiff

Finally, Plaintiff alleges that Walker "acted negligently and/or wantonly in [his] care of [Plaintiff] while he was a patient at Partlow. [Walker] had a duty to protect [Plaintiff] from harm

---

[12] The facts Plaintiff has asserted do not show that "Walker instructed [Plaintiff] to beat [his roommate] senseless with a deadly weapon." (Doc. # 47 at 32).

and failed in this duty."[13] (Doc. # 1 at ¶¶ 76-77). The Estate argues that summary judgment is appropriate because Walker's conduct was intentional, not negligent. (Doc. # 39 at 18-19). The court agrees. A reasonable jury could determine that Walker acted wantonly in his care of Plaintiff. His instruction to Plaintiff to hit his roommate involved a level of intentionality that surpasses negligence.

Wantonness "requires conduct undertaken with knowledge of the existing conditions and with consciousness that injury will likely or probably result." *Griffin v. Modular Transp. Co.*, 2014 WL 896627, at *2 (N.D. Ala. Mar. 6, 2014). However, it is not a heightened level of negligence. *See McCutchen v. Valley Home, Inc.*, 100 F. Supp. 3d 1235, 1239 (N.D. Ala. 2015). Rather, it is "an entirely different tort concept." *Id.* Negligence, on the other hand, is "usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or a design." *Lynn Strickland Sales & Service, Inc. v. Aero–Lane Fabricators, Inc.,* 510 So.2d 142, 145 (Ala.1987).

Here, the Rule 56 evidence supports the inference that Walker acted wantonly in his care of Plaintiff because his conduct rose above mere negligence. Similar to the court's analysis of Plaintiff's Section 1983 claim above, Walker's instruction to Plaintiff to hit his roommate involved an awareness of both patients' documented histories of physical aggression. He acted with knowledge of their existing conditions and instructed Plaintiff to hit R.G., despite the objective risk of injury to one or both patients. His conduct involved a higher level of consciousness than simple "inattention" or thoughtlessness." *Id.* Moreover, "[w]antonness is a question of fact for the jury, unless there is a total lack of evidence from which the jury could reasonably infer wantonness." *Id.* Because a jury could reasonably find that Walker acted

---

[13] In the Complaint, Plaintiff directs his negligence claim against "Defendants." (Doc. # 1 at ¶¶ 76-77). However, because Plaintiff clarified in his Response brief that ADMH is not being sued for any state law claims, the court analyzes the negligence claim only against Walker. (Doc. # 47 at 8).

wantonly in his care of Plaintiff, the Estate's motion for summary judgment is due to be denied in part with respect to Plaintiff's wantonness claim.

## IV.    Conclusion

For the reasons explained above, Defendant ADMH is due to be granted summary judgment on all of Plaintiff's claims. The Estate's motion for summary judgment is due to be granted in part and denied in part. All of Plaintiff's claims against the Estate, except for his Section 1983 claim in Count One and his Alabama Wantonness claim in Count Nine, are due to be dismissed. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this March 1, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE